Albob Holding Corporation, Petitioner v. Commissioner. Morris Cooper-Smith, Petitioner v. Commissioner.
Albob Holding Corp. v. Commissioner
Docket Nos. 59032, 59043.
United States Tax Court
T.C. Memo 1959-186; 1959 Tax Ct. Memo LEXIS 63; 18 T.C.M. (CCH) 817; T.C.M. (RIA) 59186; September 30, 1959
David Lazarus, Esq., for the petitioners. Theodore E. Davis, Esq., and Colin MacDonald, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: In these cases, which are hereby consolidated for decision, the respondent has determined deficiencies in the income taxes of petitioners and additions to tax under sections 291(a), 293(b), 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 for the years and in the amounts as follows: Albob Holding Corporation
Additions to Tax
Dkt.
Sec.
Sec.
No.
Year
Deficiency
291(a)
293(b)
59032
1947
$632.93
$158.23
$316.47
Morris Cooper-Smith
Additions to Tax
Sec.
Dkt. No.
Year
Deficiency
Sec. 293(b)
294(d)(1)(A)
Sec. 294(d)(2)
59043
1945
$12,283.45
$ 6,141.73
$1,105.22
$ 737.01
1946
10,472.96
5,236.48
942.55
628.38
1947
35,137.99
17,569.00
3,162.42
2,108.28
The issues presented for determination in the case of Albob Holding Corporation are the correctness of the respondent's determination *65 (1) that the corporation's gross income for 1947 was $11,014.78, its allowable deductions for business expenses and depreciation were $8,000.84, and its net income was $3,013.94, (2) that the corporation is liable under section 291(a) of the Internal Revenue Code of 1939 for an addition to tax for failure to file an income tax return for 1947, and (3) that the corporation is liable for the addition to tax provided by section 293(b) of the Code for fraud. The issues presented for determination in the case of Morris Cooper-Smith are (1) whether it was proper for the respondent to use the petitioner's bank deposits in determining the petitioner's income for 1945, 1946, and 1947, (2) whether the income determined by respondent for 1945, 1946, and 1947 should be reduced by deposits made during those years in the amounts of $4,200.07, $3,260.63, and $2,296.30, respectively, as representing the proceeds of the repayment of loans made by petitioner, exchanges, sales of personal property, and refunds received by petitioner, (3) whether the income determined for 1946 should be reduced by $2,601 as representing the cost of a tax lien purchased by petitioner in 1945 and redeemed in 1946, (4) *66 whether the income determined for 1945, 1946, and 1947 should be reduced by $7,022.96, $2,817.94, and $9,920, respectively, as representing the proceeds of the sale of certain calendars, (5) whether the income determined for 1945, 1946, and 1947 should be reduced by $1,254.11, $1,153.36, and $3,077.60, respectively, as representing the personal funds of Ida Gollin deposited by her in a bank account of petitioner, (6) whether the petitioner is entitled to deductions of $1,765.46 and $5,728.76 for 1945 and 1947, respectively, for real estate taxes paid in cash, (7) whether the respondent correctly determined the amount of depreciation the petitioner was entitled to deduct for 1945, 1946, and 1947 on account of rental properties, (8) whether the petitioner is entitled to deduct $37,056.10 for 1947 as an ordinary loss sustained on the sale in that year of real property situated at 709 West Beech Street, Long Beach, New York, (9) whether the petitioner is entitled to deduct as ordinary and necessary business expenses $1,378.50 and $25,862.93 for 1946 and 1947, repectively, on account of lumber operation on certain real property situated in Otis, Massachusetts, (10) whether $3,013.93 representing *67 the amount of Albob Holding Corporation's net income for 1947 as determined by respondent constituted a constructive dividend to petitioner for the same year, (11) whether the petitioner is liable for additions to tax under section 293(b) of the Code for 1945, 1946, and 1947 for fraud, (12) whether the assessment and collection of the deficiencies for 1945, 1946, and 1947 are barred by the expiration of the period of limitations, and (13) whether the petitioner is liable for additions to tax under sections 294(d)(1)(A) and 294(d)(2) of the 1939 Code for failure to file declarations of estimated tax and substantial underestimation of tax, respectively, for 1945, 1946, and 1947. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Albob Holding Corporation, sometimes hereinafter referred to as Albob, is a New York corporation organized in 1946 and its address at the time it filed its petition herein was c/o petitioner Morris Cooper-Smith, 110-20 73rd Road, Forest Hills 75, New York. Although it owned and operated rental properties during 1947, Albob did not keep books with respect to its operations and did not file a Federal income tax return *68 for 1947. Morris Cooper-Smith, sometimes hereinafter referred to as the petitioner, timely filed Federal income tax returns for 1945, 1946, and 1947 with the then collector for the first district of New York. After graduating from high school, petitioner, about 1913, formally studied accounting for one and one-half years during evenings. Subsequently and throughout the taxable years involved herein, 1945 through 1947, petitioner engaged in the practice of accounting. During the taxable years in question, as well as for a number of years prior thereto, petitioner had some accounting clients who employed him regularly to prepare monthly reports and make periodic audits. During the taxable years 1945 through 1947 the petitioner also held himself out to the public as a tax counselor and did accounting work for many clients for whom he did tax work. During 1945 through 1947 the petitioner maintained accounts in the following names with the indicated banks at the locations shown: Name
Bank
Location
Morris Cooper-Smith
American Savings Bank
New York, N. Y.
Morris Cooper-Smith
Franklin Savings Bank
New York, N. Y.
Morris Cooper-Smith
National Mahaiwe Bank
Great Barrington, Mass.
Morris Cooper-Smith Special
Bank of Manhattan Co.
Far Rockaway, N. Y.
Morris Cooper-Smith Special
Clinton Trust Co.
New York, N. Y.
American Calculator Company
South Shore Trust Co.
Rockville Center, N. Y.
Warranty Holding Corporation
Bank of Manhattan Co.
Far Rockaway,n. y./
Albob Holding Corporation
South Shore Trust Co.
Rockville Center N. Y.
*69 During the taxable years involved herein the petitioner received income from his accounting and tax counseling practice, the operation of rental properties, sale of real estate, and a transaction in tax liens. In addition, the petitioner received the proceeds from the sale of certain calendars. The petitioner did not maintain a cash book with respect to his various activities nor did he maintain any other books or records with respect to such activities, except check stubs, canceled checks, some receipts for the payment of property taxes, a book relating to receipts during 1945 through 1947 from certain rental properties situated in the Far Rockaway, New York, area which was kept by Ida Gollin, sister of petitioner, who participated in the management of such properties, and duplicate tickets of sales made in October, November, and December 1947 of lumber, sawdust, etc. obtained from timber cut from petitioner's land at Otis, Massachusetts. The records so maintained by petitioner were inadequate for fairly or correctly reflecting his income for the years in question. Being unable to reconcile the income reported by petitioner in his income tax returns with his bank deposits, the respondent *70 determined the petitioner's income for the years in question by using the petitioner's bank deposits. Albob Holding Corporation Findings of Fact Throughout the 12 months of 1947, Albob owned and operated the following rental properties: 7236 Burchell Avenue, Rockaway Beach, N. Y. 1900 Lockwood Avenue, also known as 1900 Brookhaven Avenue, Far Rockaway, N. Y. During the month of December 1947, Albob also owned and operated the rental property, 1362 Gipson Street, Far Rockaway, New York. Petitioner Morris Cooper-Smith owned the Burchell Avenue and Lockwood Avenue properties during 1945 and 1946 and the Gipson Street property during those years and to December 1947. Idlewild Manufacturing Company was a tenant of the Burchell Avenue property during 1947. Cooper-Smith never has been a stockholder in Albob. However, during 1947, he was president of it and signatory for all of its corporate work and as president managed its rental properties, using in connection therewith the services of an agent of his, Ida Gollin. During 1947 an account was maintained in the name of Albob with the South Shore Trust Company, Rockville Center, New York, in which rents of at least $7,511.93 from *71 Albob's properties were deposited in that year. While some of the rents from Albob's properties were deposited in the account, not all of them were. At Cooper-Smith's direction, some of the rents collected from the properties by his agent were used by the agent to pay some of the expenses of operating the properties, some of the rents were deposited by the agent in Cooper-Smith's account with the Bank of Manhattan Company, Far Rockaway, New York, and some were paid by the agent to Cooper-Smith, who deposited them in his account with the Clinton Trust Company, New York, New York, or in some of his other bank accounts. Cooper-Smith used his account with Clinton Trust Company, the account in the name of American Calculator Company, with South Shore Trust Company, Rockville Center, New York, and all of his other bank accounts to make payment of his personal expenses. In determining the deficiency in tax against Albob for 1947, the respondent determined Albob's gross income, allowable deductions, and net income as follows: Gross income from rents
$11,014.78
Deductions
Business expenses
Petty cash
$ 791.39
Operating expenses
3,650.59
Interest on mortgage
243.76
Insurance
125.00
Taxes
1,618.65
Water
171.00
Allocable expenses
978.45
$7,578.84
Depreciation
422.00
8,000.84
Net income
$ 3,013.94
*72 The deficiency in tax determined by the respondent was due to the fraud of Albob with intent to evade the tax upon its income. Opinion The respondent has determined a deficiency in income tax against Albob for 1947 and has determined deficiencies in income tax against Morris Cooper-Smith for 1945, 1946, and 1947. Statements made by counsel for the respondent in his opening statement and on brief are to the effect that respondent determined that Albob during 1947 was a corporation whose entity was to be recognized and accordingly determined the deficiency in question against it; that the same income upon which the deficiency against Albob was determined was also included in the income of Morris Cooper-Smith upon which the deficiency against him for 1947 was determined; that the respondent is proceeding herein primarily against Morris Cooper-Smith and alternatively against Albob; but that if we should conclude that Albob was a corporation whose entity is to be recognized, we should sustain the deficiency determined against Albob. In view of the foregoing we will consider first the question of whether Albob is to be recognized as a corporate entity separate and apart from Cooper-Smith. *73 The petition filed in the case of Albob was signed and sworn to by Cooper-Smith as president. Paragraph 1 of the petition contains the following allegations: "Petitioner is a New York State Corporation, whose correct address is Albob Holding Corporation c/o M. Cooper-Smith, 110-20 73rd Road, Forest Hills 75, New York. No return was filed." In his answer, the respondent admitted the foregoing allegations. Cooper-Smith testified that Albob was organized in 1946, that during 1947 it owned and operated the rental properties set out in our findings of fact, that also during that year he was president of it, signatory for all of its corporate work, and as president managed its rental properties through an agent of his. He further testified that he has never been a stockholder in Albob. He also testified to the depositing of rents received from Albob's properties in bank accounts maintained by him, other than in the name of Albob, and his use of all bank accounts maintained by him for payment of his personal expenses. With respect to the recognition or nonrecognition of corporate entities, the Supreme Court in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, *74 said: "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. New Colonial Co. v. Helvering, 292 U.S. 435, 442, 54 S. Ct. 788, 791, 78 L. Ed. 1348; Deputy v. Du Pont, 308 U.S. 488, 494, 60 S. Ct. 363, 366, 84 L. Ed. 416. * * * "To this rule there are recognized exceptions. Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S. Ct. 540; 62 L. Ed. 1142; and Gulf Oil Corp. v. Lewellyn, 248 U.S. 71, 39 S. Ct. 35, 63 L. Ed. 133, have been recognized as such exceptions but held to lay down no rule for tax purposes. New Colonial Co. v. Helvering, supra, 292 U.S. 442, 54 S. Ct. 791, 78 L. Ed. 1348, note 5; Burnet v. Commonwealth Imp. Co., supra, 287 U.S. 415, 420, 53 S. Ct. 199, 77 L. Ed. 399. *75 * * * In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. Higgins v. Smith, 308 U.S. 473, 477, 478, 60 S. Ct. 355, 357, 358, 84 L. Ed. 406; Gregory v. Helvering, 293 U.S. 465, 55 S. Ct. 266, 79 L. Ed. 596, 97 A.L.R. 1355." In considering the decision of the Supreme Court in the Moline Properties case, the Court of Appeals for the Second Circuit in National Investors Corporation v. Hoey, 144 F. 2d 466, said: "In that case the question was whether the corporation might insist upon the Treasury's including capital gains within the gross income of its sole shareholder and the court decided that it might not. That was the same situation as existed in Burnet v. Commonwealth Improvement Co., supra, 287 U.S. 415, 53 S. Ct. 198, 77 L. Ed. 399. The gloss then put upon Higgins v. Smith, supra, was deliberate and is authoritative: it was that, whatever the purpose of organizing the corporation 'so long as that purpose is the equivalent of business activity or is followed by the carrying on of business *76 by the corporation, the corporation remains a separate taxable entity.' 319 U.S. 439, 63 S. Ct. 1134, 87 L. Ed. 1499. That, as we understand it, is the same interpretation which was placed upon corporate reorganizations in Gregory v. Helvering, 293 U.S. 465, 55 S. Ct. 266, 79 L. Ed. 596, 97 A.L.R. 1355, and which has sometimes been understood to contradict the doctrine that the motive to avoid taxation is never, as such, relevant. In fact it does not trench upon that doctrine; it merely declares that to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and that escaping taxation is not 'business' in the ordinary meaning." In view of what was said in the Moline Properties case and the National Investors case, it is clear that whatever the purpose of organizing a corporation, "so long as that purpose is the equivalent of business *77 activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." The record does not contain any evidence directed to the purpose for which Albob was formed. However, the record is clear that Albob during 1947 was engaged in operating the rental properties owned by it. That constituted carrying on business, John D. Fackler, 45 B.T.A. 708, affd. 133 F. 2d 509, and is sufficient to require that Albob be recognized as a taxable entity separate and apart from Cooper-Smith. The fact that Cooper-Smith, Albob's president, who was not a stockholder in Albob, as a result of the commingling of some rental receipts of Albob with his own funds, may have devoted some of such receipts to his personal use does not, in our opinion, require that the corporate entity of Albob be disregarded. Implicit in the respondent's determination of the deficiency against Albob was a determination that Albob was a bona fide corporation and not a mere sham. In the situation presented, we think such determination as to bona fides was correct and we sustain it. In the petition filed by Albob, error is assigned to the respondent's *78 determination of Albob's gross income, business expenses, depreciation, and net income. The assignment of error was denied by respondent in his answer. In this situation and since the respondent's determination is presumed to be correct, it was incumbent on Albob to show that the respondent's determination was erroneous. This Albob has failed to do. We have found that in 1947 rents of at least $7,511.93 from Albob's properties were deposited in the bank account maintained in the name of Albob and that other rents received, the amounts of which are not shown, were used for operating expenses or deposited in accounts of Cooper-Smith. Other than the foregoing, the record does not indicate the extent of Albob's gross income nor does it show the amount of its business or operating expenses. Throughout 1947 Albob owned and operated 7236 Burchell Avenue and 1900 Lockwood Avenue and during December 1947 owned and operated 1362 Gipson Street. During 1945 and 1946 the petitioner owned all of the foregoing properties and until December 1947 owned the Gipson Street property. Although Cooper-Smith gave considerable testimony directed to the basis of each of the three properties for depreciation *79 purposes while they were owned by him, we are unable to find that the properties had the same basis when owned by Albob as they had in the hands of Cooper-Smith. The record is silent as to the manner in which Albob acquired the properties. Since Cooper-Smith owned the properties preceding their acquisition by Albob and since he was never a stockholder in Albob, the properties apparently were not acquired from him by Albob in exchange for its stock. If Albob acquired the properties by purchase, then the record is silent as to the purchase price and the portion thereof properly allocable to the depreciable part of the properties. In this situation we cannot find that the respondent's determination of the amount deductible for depreciation was erroneous. On the record before us we are unable to find that respondent erred in determining Albob's gross income, deductions, and net income. Section 52 of the 1939 Code provides that every corporation subject to taxation under Chapter 1 - Income Tax - of the Code shall make a return, stating specifically the items of its gross income and the deductions *80 and credits allowed by the chapter and that such return shall be sworn to by the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer. Section 29.52-1 of Regulations 111 relating to the 1939 Code provides that every corporation not expressly exempt from tax must make a return of income, regardless of the amount of its net income. Since Albob failed to file a return and since the record does not show that its failure was due to reasonable cause and not due to willful neglect, it is liable for the addition to tax provided by section 291(a) of the Code as determined by the respondent. The remaining issue is whether Albob is liable for the addition to tax for fraud provided in section 293(b) of the Code as determined by the respondent. On this issue the respondent has the burden of proof. An affirmative willful attempt to defeat and evade income tax may be inferred from conduct such as covering up sources of income, handling of *81 one's affairs to avoid making the records usual in transactions of the kind of such affairs, and any conduct the likely effect of which would be to mislead or to conceal. Spies v. United States, 317 U.S. 492. Corporations can act only through their officers and other duly authorized persons. Here Albob derived income from its rental properties. Cooper-Smith as president of Albob managed those properties and in connection with his management employed as his agent his sister, Ida Gollin. Cooper-Smith was a trained and experienced accountant and in addition was a tax counselor with many clients. Obviously with such a background he was well aware that proper accounting records should be maintained with respect to Albob's affairs. Yet, when during the trial he was asked by the Court if Albob had a set of books, he answered "None." Although a bank account was maintained in the name of Albob, Cooper-Smith testified that all the rents collected on Albob's properties were not deposited in that account and that he was unable to state which of the properties of Albob was the source of *82 rentals deposited in the account. He stated that his agent, and not he, collected the rents from Albob's properties, that the agent used part of the rents to pay operating expenses, deposited part of the rents in his (Cooper-Smith's) account with the Bank of Manhattan Company, Far Rockaway, New York, and paid part of the rents to him and that he deposited these in his account with Clinton Trust Company or in some of his other bank accounts. Cooper-Smith placed in evidence a book which he testified was kept by his agent in the regular course of business from January 1943 through December 1948 with respect to rentals received by her. Although the agent appeared as a witness later during the trial, she neither was asked to give nor did she give any testimony explaining the book or her method of keeping it or as to the accuracy or completeness of the book. An examination of the book discloses some entries indicating the receipt of rentals from 1362 Gipson Street under dates in December 1947, the only month in that year when Albob owned that property, but the book fails to disclose any entry respecting the rents collected on the Burchell Avenue and the Lockwood Avenue properties which were *83 owned by Albob throughout 1947. From the record presented we think it is clear that Cooper-Smith as president of Albob so managed the affairs and rental properties of Albob as to avoid making the records usual in the management and operation of rental properties and that this was done to mislead and to conceal Albob's true income. Under the circumstances his conduct is to be regarded as Albob's conduct. Accordingly, we have concluded and found as a fact that the deficiency in question was due to the fraud of Albob with the intent to evade tax upon its income. The respondent's determination as to this issue is sustained. Morris Cooper-Smith Issue 1. Determination of income by use of bank deposits. Findings of Fact In his income tax returns for 1945, 1946, and 1947, the petitioner showed his occupation as "Real Estate, etc." and reported losses of $1,263.40, $1,494.34, and $36,444.67, respectively, as having been sustained in such occupation. The petitioner's computation of the respective losses reported was set out in schedules attached to the respective returns. The starting point in the computation of the loss reported for 1945 was shown as follows: Gross receipts A
$16,900.00
Gross receipts O
12,705.26
Total receipts
$29,605.26
*84 The starting points for the computation of the losses reported for 1946 and 1947 were the following: 1946
Total income and rents from
properties
$29,745.00
1947
Total income from properties
also fees
$39,505.50
The letter "A" appearing after the first item of gross receipts shown for 1945 was used by petitioner to indicate receipts from his accounting practice. The letter "O" appearing after the second item of gross receipts shown for 1945 was used by petitioner to indicate receipts from all sources other than his accounting practice. The receipts thus indicated as received from his accounting practice consisted of an undisclosed amount of gross receipts and an undisclosed amount of net receipts from such practice resulting from instances where petitioner employed other accountants to do the work. The receipts indicated as having been obtained from other sources consisted of an undisclosed amount of "the gross benefits of [rental] properties which were in" the name of petitioner or his wife and an undisclosed amount of "the net benefits to" petitioner on other rental properties in which he "had an interest." Some of the rental properties involved were *85 owned by corporations. Two of such corporations were Premium Bond Corporation and Warranty Holding Corporation. During 1945, 1946, and 1947 the petitioner was president of those corporations, neither of which filed an income tax return for any of those years. The amounts shown as "Total Income & Rents from properties" and as "Total Income from properties also fees" for 1946 and 1947, respectively, were substantially composed of items of the same character as the items composing the gross income reported by petitioner for 1945. Beginning about 1933 the petitioner leased a suite of five rooms at 33 West 22nd Street, New York, New York, which he thereafter and through 1947 used for all purposes as his New York office. On some undisclosed date prior to 1945, Cooper-Smith, Inc., a New York corporation of which the petitioner was the sole stockholder, leased a suite of four rooms across the hall from the petitioner's office. After the corporation "ceased to be active" the petitioner "maintained" that suite of rooms and during 1945, 1946, and 1947 sublet them to various tenants among whom were accountants who paid their rent to petitioner by doing accounting work for him. The petitioner *86 does not know the amount of rentals he received during the years 1945, 1946, and 1947 from subletting the rooms nor the extent to which accountants paid rent by rendering services to him. Such records as the petitioner made with respect to the income he received from his tax counseling services during 1945, 1946, and 1947 were destroyed by him long ago. Opinion The petitioner, like every other taxpayer, was required by law to file an income tax return for each of the taxable years involved herein and to report thereon fully and honestly every item of gross income received by him. Inherent in that requirement was the further requirement that he maintain adequate records of some kind to show to him and to the respondent the amount of income received by him in each year and the nature and basis for any deductions claimed. The respondent is not required to accept as accurate, complete, and correct, the returns filed or the sworn statement of the taxpayer that his returns completely and correctly disclose his tax liability. The respondent has authority to check the returns against the records of the taxpayer and if no records have been kept or if the records are incomplete, inaccurate, *87 or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law. Where the available records of the taxpayer do not fairly show the income of the taxpayer for the years in question, the respondent may use the taxpayer's bank deposits in determining taxable income. Louis Halle, 7 T.C. 245, affd. 175 F. 2d 500, certiorari denied 338 U.S. 949; Estate of Robert Lyons Hague, 45 B.T.A. 104, affd. 132 F. 2d 775, certiorari denied 318 U.S. 787. Having heretofore found that the records maintained by petitioner for 1945, 1946, and 1947 were inadequate for fairly or correctly reflecting his income, we are of the opinion that the respondent acted within his authority in employing the petitioner's bank deposits in determining the petitioner's taxable income for those years. Issue 2. Reduction of income on account of deposits representing checks cashed by petitioner, checks received in repayment of loans made by petitioner, and checks received as *88 refunds. Opinion The petitioner testified that during the taxable years in question he cashed checks for others and also received checks in small amounts in payment of loans made to others. He further testified that during those years, he, his wife, and his children received checks in payment of railroad refunds, department store refunds, air travel refunds, gas and electric deposit refunds, and a refund from a dealer in stationery. He also testified that the checks received from the foregoing sources were deposited in bank accounts of his, but principally in his account at the Clinton Trust Company. He further stated that some United States bonds were cashed and the proceeds credited to his account at the bank where the bonds were cashed. He stated that during the years in question he did not keep a cash book but that instead when he personally made a bank deposit, he prepared a duplicate deposit slip upon the back of which he noted the name or initials of the parties whose respective checks were included in that deposit and the duplicate deposit slip was stamped by the bank and that when he made a deposit by mail, he made a memorandum as to the parties whose respective checks *89 were included in the deposit. He stated that he retained the duplicate deposit slips and the memoranda respecting his bank deposits during the years in question and was able therefrom to identify the checks received from the above-mentioned sources during those years which were deposited in his bank accounts. He placed in evidence as a part of Exhibit No. 28 schedules designated "Loans & Exchanges" and "Credits to M. & S. Cooper-Smith" listing for the respective taxable years numerous amounts and sources as representing checks received from the above-mentioned sources and deposited in bank accounts of his. He also stated that he had in his possession the duplicate deposit slips and memoranda used by him in preparing the above-mentioned schedules. On the basis of his testimony and the schedules, the petitioner asks us to find that during 1945, 1946, and 1947 (1) that he cashed checks for others and deposited in his bank accounts the checks so received in the total amounts of $2,649.52, $2,306.13, and $1,815.26, respectively, (2) that he and his wife received checks for items of a personal nature not constituting income which were deposited in his bank accounts in the total amounts of *90 $1,550.55, $954.50, and $481.04, respectively, and (3) that the foregoing amounts in (1) and (2) were improperly included by respondent as income of the petitioner for the respective years. We are unable to make the findings sought by the petitioner. The following occurred on cross-examination: "Q. I hand you Exhibit 28, and I ask you if it isn't a fact that this exhibit was prepared on the basis of deposit slips, that is, deposit slips identifying specifically each item of deposit? "A. Deposit slips and my memorandum of deposits mailed. "Q. Is that your practice with respect to deposits; that is, you kept a memoranda or specified and identified specifically each item of deposit on your deposit slips retained? "A. Usually yes; I don't have a cash book. "Q. Will you hand to me the deposit slips for all the bank deposits made to all the banks during the years 1945 to 1947?" Thereupon the petitioner became evasive, did not hand counsel for the respondent any duplicate deposit slips and no duplicate deposit slips were offered in evidence by petitioner either with respect to the issue here involved or any other issue involved in the case. Subsequently, during cross-examination *91 the following occurred: "Q. Did you not state you kept specific memoranda with respect to deposits mailed? "A. Yes, I kept memorandum with respect to deposits mailed, but I didn't keep a mailing acknowledgment slip beyond the first or second of the following month. "Q. Will you hand to me that memorandum with respect to all deposits mailed during the years 1945 to 1947? "A. I have it scribbled down on a lot of notes in here (indicating). "Q. May I see it? "A. I don't know whether you should become possessed of it. I have got a lot of other personal notes in here. I can point out to you any specific entry you refer to." The petitioner did not hand counsel for the respondent any memorandum and subsequently the following occurred on cross-examination: "Q. Do you have complete data in support of Exhibit 28 by way of deposit slips or memoranda? "A. I don't have that in that form here either. Some of those papers have outlived their usefulness by the time I got the bank statement the first of the following month. "Q. Upon what and how did you prepare Exhibit 28, from what data? "A. From the memoranda that I have accumulated from these memorandum slips that I compiled *92 each time I made a deposit. "THE COURT: Is that the memorandum you now say you do not have here in Court? "THE WITNESS: I don't have it here, no." The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. This is especially true where, as here, the party failing to produce the evidence has the burden of proof. Wichita Terminal Elevator Company, 6 T.C. 1158, affd. 162 F. 2d 513. In determining the petitioner's income for the years 1945 and 1947 the respondent has allowed reductions as follows: 1945
1947
Exchanges: Alice Cooper-Smith
$ 843.69
$ 500.00
I. C. Gollin
2,114.94
Coupons cashed for others
856.35
1,950.00
Check
3,033.83
Loans repaid
1,366.74
In view of the reductions allowed by respondent and in view of the record presented as to the amounts which the petitioner here seeks to have allowed as reductions, we hold for the respondent as to this issue. *93 Issue 3. Reduction of income on account of a tax lien purchased in 1945 and paid in 1946. Opinion Although the petitioner's income tax return for 1946 does not disclose that during that year he was in receipt of income from any transaction involving a tax lien, the petitioner testified that in the fall of 1945 he purchased a tax lien, described as No. 71214-A, for which he paid $2,601 and that on January 24, 1946, he received in payment of the lien "net proceeds of $5,300," $5,000 of which was represented by a certified check and $300 was cash. Thereupon the following occurred: "THE COURT: What do you mean by net proceeds? "THE WITNESS: There were three expenses incurred in connection with that lien. I paid for a search, $1. I paid the Title Company, $17.75. I paid my attorneys, Bornstein & Bornstein, $200, and I paid William H. Parry for a survey, $35. The total payments that I paid were $415.75; the proceeds of the sale, figuring lien and interest, amounted to $5,654.86, making a net amount to me of $5,239.11. "I got a certified check of $5,000 and I got cash in the amount of $239.11 to which I added $60.89 of my own money and made an even deposit of $300. At the same *94 time I deposited the $5,000 certified check." Aside from the fact that the total of the four payments mentioned in the foregoing testimony is only $253.75 and not $415.75 as stated by the petitioner, the petitioner has not shown nor attempted to show, nor does he make any claim as to when or where he deposited the certified check and the cash mentioned in his testimony. Nor has he otherwise attempted to identify those items as constituting deposits which the respondent used in determining his income for 1946. In this state of the record the petitioner contends that we should find that his income for 1946 as determined by respondent should be reduced by $2,601 as representing the cost of the lien which was paid in 1946. The respondent contends that no reduction should be made because the petitioner has failed to establish that the check and the cash in question were deposited in any bank account maintained by him. Although a schedule, put in evidence by stipulation, of the deposits made during 1946 in petitioner's account at Clinton Trust Company shows under date of January 25, 1946, two deposits made to that account, the first in the amount of $5,000 and the other in the amount *95 of $300, neither the schedule, nor the record otherwise, shows of what those deposits consisted. In the absence of evidence showing that the deposits consisted of the check and cash in question, we cannot find that they did. On the record presented the respondent is sustained as to this issue. Issue 4. Reduction of income on account of proceeds of sale of calendars. Findings of Fact In 1923 Cooper-Smith, Inc., a New York corporation engaged in the business of manufacturing and selling calendars at 34th Street and 8th Avenue, New York City, and all of whose capital stock was owned by petitioner, purchased a quantity of paper from Perkins-Goodwin Company for use in manufacturing "perpetual" calendars which could be used at intervals of approximately 7 years. After the calendars had been printed on the paper and during the process of binding them, it developed that the grain in the paper ran in the wrong way and as a result the calendar sheets rumpled in the wrong direction and would not stay in the calendar stands. Because of this defect in the calendars they could not be sold in a normal market. As a result a suit for damages was brought by the corporation against Perkins-Goodwin *96 Company, but the suit terminated adversely to the corporation. During the litigation the calendars were in a warehouse. When the litigation terminated, petitioner decided to sell the calendars during that series of years he would be able to do so. While petitioner could have sold the calendars about 1940, he was busy with real estate and did not do so. The cycle for selling them came again in 1945, 1946, and 1947, when because of the scarcity of metal and paper he was able to sell them at a more attractive price than at any time prior thereto. During or subsequent to 1933 but prior to 1945 Cooper-Smith, Inc., leased a suite of four rooms at 33 West 22nd Street, New York City. The rooms were situated across the hall from where the petitioner maintained his New York City office. The corporation used the suite of rooms in its business until an undisclosed time prior to 1945 when it "ceased to be active." Thereupon the petitioner, in addition to maintaining his own office, leased and maintained for subletting purposes the suite of rooms which the corporation had occupied. During each of the years 1945, 1946, and 1947, petitioner sold some of the calendars at an undisclosed price or *97 prices. Some of the sales were made to a Chicago newspaper, some to a Philadelphia newspaper, and some to a San Francisco newspaper. The newspapers used the calendars in subscription campaigns which they were running. No part of the proceeds from the sale of the calendars in 1945, 1946, and 1947 was reported as income by petitioner in his income tax returns for the respective years. Opinion The petitioner testified that the number of calendars involved was 200,000 and that the cost to Cooper-Smith, Inc., to manufacture them in 1923 was approximately $93,000, composed of the following items and approximate amounts: Paper
$20,000
Printing and plates
20,000
Stands and binding
20,000
Office overhead
33,000
Total
$93,000 No books, records, or documents of any character were submitted by petitioner in support of the foregoing testimony. Without attempting to show by any books or other records kept by him the number of calendars sold in the respective taxable years, the price or prices at which sold, or the total proceeds of sales received in the respective years, the petitioner testified that a portion of the proceeds received was deposited in bank accounts *98 of his, a portion was used by him to pay real estate taxes and a portion was used by him to purchase tax liens. He further testified that after making an analysis of all of his bank deposits he had prepared a schedule, sometimes hereinafter referred to as the calendar schedule, showing the disposition of all proceeds of sales of the calendars received in the respective years, whether deposited or retained by him. The calendar schedule was placed in evidence by petitioner as part of Exhibit No. 28, the other schedules of which exhibit were considered above in connection with issue 2. The calendar schedule sets forth the following with respect to sales and sales proceeds: Portion of
Portion of
Total
Total Pro-
Total Pro-
No. of Sales
Proceeds
ceeds Deposited
ceeds Retained
Year
During Year
of Sales
by Petitioner
by Petitioner
1945
20
$ 7,022.96
$ 7,022.96
1946
10
5,922.54
2,817.94
$3,104.60
1947
9
16,744.55
9,920.00
6,824.55
Total
39
$29,690.05
$19,760.90
$9,929.15 No books, records, duplicate deposit slips, memoranda, or documents of any character were submitted by petitioner in support of the calendar schedule. *99 Relying on his testimony and the calendar schedule the petitioner in his original brief takes the position that the calendars were sold for less than the cost of manufacturing them, that therefore no part of the proceeds of sale of the calendars constituted income to him and that his income as determined by the respondent for 1945, 1946, and 1947 should be reduced by the amounts of $7,022.96, $2,817.94, and $9,920, respectively, as representing the proceeds from the sale of calendars which he deposited in his bank accounts during the respective years. The petitioner's reply brief contains the following statement: "There is, in fact, a basic flaw in respondent's position on the calendar sales. He has disregarded the corporate entity in all other respects yet, on this issue he insists that, while the receipts must be charged to petitioner, their cost can not be credited to him because they were manufactured by a corporation, M. Coopersmith, Inc. Respondent's position is particularly illogical in view of the fact that petitioner owned all of the stock of M. Coopersmith, Inc. and personally guaranteed the purchase." According to the testimony of the petitioner the corporation was *100 engaged in the business of manufacturing and selling calendars in 1923. In the conduct of that business it purchased the paper on which the calendars in question were printed and brought suit for damages against the seller of the paper. Thereafter during 1933 or subsequently it leased a suite of rooms which it used in the conduct of its business until some undisclosed time prior to 1945 when it "ceased to be active." On the basis of the foregoing and in view of what is set forth above in the case of Albob respecting the recognition or nonrecognition of corporate entities, we think the corporation is to be regarded as an entity separate and apart from the petitioner during 1923 and subsequent years until the time when it "ceased to be active." The phrase "ceased to be active" is not explained in the record and in the absence of evidence to the contrary we take it to mean that the corporation discontinued business, distributed its assets, and thereafter remained dormant. Under section 239(a) of the Revenue Act of 1921 every corporation subject to taxation under Title II - Income Tax - of that *101 Act was required to make a return stating specifically the items of gross income and deductions and credits allowed by that title. Later Revenue Acts and the Code of 1939 contained like requirements. Section 203 of the Revenue Act of 1921 provided that whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. Later Revenue Acts and the Code of 1939 contain similar requirements. Article 1581 of Regulations 62 (1922 Edition) relating to income tax under the Revenue Act of 1921 contains the following: "Need of inventories. - In order to reflect the net income correctly, inventories at the beginning and end of each year are necessary in every case in which *102 the production, purchase, or sale of merchandise is an income producing factor. * * *" Article 1582 of the same regulations provides for the valuation of inventories on the basis of "(a) cost or (b) cost or market, whichever is lower." In addition, it provides that: "Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections * * * should be valued at bona fide selling prices less cost of selling whether basis (a) or (b) is used * * * but in no case shall such value be less than the scrap value * * * The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classification indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made." Since the corporation was engaged in the business of manufacturing and selling calendars, the use of inventories was necessary to reflect its net income correctly. *103 Section 202(a)(1) of the Revenue Act of 1921 provided that if property should have been included in the last inventory, the last inventory value thereof shall constitute the basis for determining gain or loss on the sale or other disposition of the property. Section 113(a)(1) of the Code of 1939 is to a similar effect. The petitioner has not shown the value at which the calendars in questions were included or were includible in the corporation's inventory at December 31, 1923, or at any subsequent date. All we are told is that because of their defectiveness they were not salable in a normal market in 1923, that thereafter they were not otherwise salable until 1940, or 17 years later, and that they were not sold until during 1945 through 1947. In such a state of the record and since it is not shown otherwise, it may well be that the corporation long prior to 1940 had eliminated the calendars as an item of its inventory and thereby obtained a deduction from its income of the entire cost of manufacturing the calendars. In such case the calendars would have no inventory value and the basis for computing gain or loss on their subsequent sale by the corporation would have been zero. Since *104 the sale of the calendars occurred after the corporation "ceased to be active," since it does not appear that the corporation filed any income tax returns for the years in which the sales were made, since the petitioner's testimony does not indicate that he made the sales in the capacity of an officer of the corporation or in some other capacity on behalf of the corporation, and since it is shown that the petitioner devoted receipts from the sale of the calendars to his own personal use, we conclude that he made the sales as owner of the calendars and in his own behalf. In view of the foregoing and since there is nothing in the record to indicate that petitioner's cost or other basis for the calendars was other than zero, we are unable to find that the petitioner's income as determined by respondent for 1945, 1946, and 1947 should be reduced by the amounts contended for by petitioner or any other amounts on account of proceeds from the sale of calendars having been deposited in bank accounts of the petitioner. The respondent is sustained as to this issue. Issue 5. Reduction of income on account of deposit of Ida Gollin's personal funds in a bank account of petitioner. Findings *105 of Fact During 1945, 1946, and 1947 Ida Gollin was employed by petitioner as general manager of his properties in the Far Rockaway, New York, area. During those years she had a power of attorney from the petitioner to sign checks drawn on his account at the Bank of Manhattan Company, Far Rockaway, New York. Neither she nor her husband had a personal checking account. With the permission of the petitioner she used his account at the Bank of Manhattan Company for the deposit and the disbursement of her personal funds. She recorded in a book kept by her for that purpose all amounts of her personal funds she deposited in petitioner's account with the dates of deposit and all amounts disbursed by her from the account for her personal purposes with the dates of disbursement. Opinion At the trial the petitioner conceded that in the determination of his income for 1945 and 1947 the respondent had eliminated from his bank deposits the amounts of $70.64 and $2,114.94 representing deposits made during those years by Ida Gollin of her personal funds. However, the petitioner contends that his income for 1945, 1946, and 1947 as determined by respondent also should be reduced by the amounts *106 of $1,254.11, $1,153.36, and $3,077.60, respectively, because of deposits made by Ida Gollin of her personal funds in the above-mentioned account of the petitioner during those years. The respondent concedes on brief that the petitioner is entitled to the reductions contended for. The petitioner is sustained as to this issue. Issue 6. Deductions for real estate taxes paid in cash. Findings of Fact During the years 1945 through 1947 the petitioner paid real estate taxes partly by check and partly in cash. During 1945 and 1947 the petitioner paid total real estate taxes as follows: 1945
By Check
In Cash
Total
$8,112.84
$1,765.42
$ 9,878.26
1947
$6,939.43
$5,728.76
$12,668.19
In determining the petitioner's net income for 1945 and 1947 the respondent allowed deductions as follows: 1945
1947
Real estate expenses paid in
cash: Petty cash expenses
$2,671.66
$2,627.07
Checks drawn to cash - 50%
disallowed - unsubstan-
tiated
1,530.81
1,970.00
Total
$4,202.47
$4,597.07
Opinion The petitioner contends that since he paid real estate taxes in cash in 1945 and 1947 in the amounts of $1,765.42 and $5,728.76, respectively, *107 he is entitled to those amounts as deductions in determining his net income for the respective years and that his net income for those years as determined by respondent should be reduced by the respective amounts. Respecting the reduction of petitioner's net income as determined by him for 1945 and 1947 by the foregoing respective amounts of real estate taxes, the respondent makes the following statement in his brief: "Respondent agrees that to the extent that real estate taxes paid in cash in 1947 in the amount of $5,728.76 exceeds $4,597.07, the sum of the amounts previously allowed by respondent for petty cash expenses and checks drawn to cash (Exh. GG) [sometimes referred to in the record as the master sheet], a reduction of petitioner's net income for the said year, as reflected in the notice of deficiency, should be made. There being no such excess for 1945, no allowance is made herein." Exhibit GG or the master sheet, among other things, contains a list of the banks at which the petitioner had accounts during 1945 through 1947 and the amount which respondent determined had been deposited in each account during the respective years. On the direct examination of the petitioner *108 he was asked the following question by his counsel, to which he gave the indicated answer: "Q. Mr. Cooper-Smith, can you tell us whether any of the cash payments, whether any of the cash used for the payment of these [real estate] taxes, was drawn by checks against any of the bank accounts referred to in the master sheet? "A. No." Since in determining the petitioner's net income for 1945 and 1947 the respondent has allowed deductions of $4,202.47 and $4,597.07, respectively, for petty cash expenses and for checks drawn to cash, in order for the petitioner to prevail it was incumbent on him to show that the amounts which he here seeks to have allowed as deductions represented cash expenditures, the entire amount of which was separate and apart and in addition to the amounts allowed by respondent. The petitioner has not made such a showing and according to his abovequoted testimony he is unable to do so. Since the amount of taxes paid in cash in 1945, $1,765.42, is less than the total of $4,202.47 allowed by respondent for petty cash expenses and for checks drawn to cash, we hold that the petitioner is not entitled to the deduction here sought for 1945. Since the amount of *109 taxes paid in cash in 1947, $5,728.76, exceeds $4,597.07, the total allowed by respondent for petty cash expenses and for checks drawn to cash, by $1,131.69, we hold that the petitioner is entitled to the latter amount as a deduction for real estate taxes paid in cash in 1947. Issue 7. Depreciation of rental properties. Issue 8. Loss on sale of real property situated at 709 West Beech Street, Long Beach, New York. Findings of Fact In his income tax return for each of the years 1945, 1946, and 1947, the petitioner took a deduction of $5,775 for depreciation of rental properties which was explained in identical schedules as follows: Property Cost
Value for
3%
Amount of
and Improvements
Depreciation
Location
Rate
Depreciation
$111,322.55
$60,000
300 B. 67th St.
$1,800
39,900.92
24,000
2920 Healy Ave.
720
41,434.17
26,500
2802 Bayswater Ave.
795
82,477.48
51,000
1900 Lockwood Ave.
1,530
42,740.77
31,000
1362 Gipson St.
930
Total
$5,775 The schedules for the years 1946 and 1947 contained statements to the effect that the foregoing properties were situated in Far Rockaway and Rockaway Beach, New York. In *110 determining the petitioner's net income for 1945, 1946, and 1947, the respondent allowed deductions of $1,683.54, $1,709.84, and $1,807.19, respectively, for depreciation of the petitioner's rental properties. The foregoing allowances were determined as follows: Cost of
Depreciation Allowed
Land and
Property
Buildings
Date of Deed
1945
1946
1947
300-316 B. 67th St., Arverne, N. Y.
$13,000.00
May 18, 1933
2920 Healy Ave., Far Rockaway, N. Y.
5,000.00
Sept. 27, 1934
2802 Bayswater Ave., Rockaway, N. Y.
3,750.00
Aug. 12, 1935
1900 Lockwood Ave., Far Rockaway, N. Y.
4,250.00
Nov. 17, 1934
1362 Gipson St., Far Rockaway, N. Y.
2,500.00
Sept. 30, 1935
7236 Burchell Ave., Rockaway Beach, N. Y.
13,333.33
Dec. 4, 1934
709 West Beech St., Long Beach, N. Y.
19,000.00
Sept. 24, 1924
Total
$60,833.33
Value of land - 20% of $60,833.33
12,166.66
Value of buildings
$48,666.67
Improvements 1943
240.00
Improvements 1944
2,721.10
Improvements 1945
4,490.43
Depreciation for 1945 at 3%
$56,118.20
$1,683.54
Improvements 1946
876.55
Depreciation for 1946 at 3%
$56,994.75
$1,709.84
Improvements 1947
760.78
Depreciation for 1947 at 3%
$57,755.53
$1,732.66
19 Cuthbert Road, Kew Gardens
$ 1,151.00
Dec. 30, 1946
Cost of land - 20% of $1,151.00
230.20
Depreciation at 3%
$ 920.80
$ 28.62
Improvements 19 Cuthbert Road, Kew
Gardens - Depreciation 3% for 6 months
$ 3,060.48
45.91
$1,807.19
*111 The 300-316 B. 67th Street property in Arverne, New York, was purchased by petitioner in 1932. At the time petitioner acquired the property it consisted of a one-story, one-family bungalow and a two-story summer hotel with restaurant and tavern, the ground on which the buildings stood and a vacant lot 40 feet by 140 feet in dimensions. After acquiring the property the petitioner demolished the buildings and in 1934 on the site of the bungalow erected an apartment house containing three five-room apartments, two four-room apartments, and one three-room apartment, each apartment with one bath. In 1934 on the site of the hotel building the petitioner erected an apartment house containing eight three-room apartments, each apartment with one bath. In addition, this apartment house contained three commercial store rooms. In 1935 on the vacant lot the petitioner erected an apartment house containing three seven-room apartments, each with two baths and three four-room apartments, each with one bath. Each of the apartment houses had steam heat. The cost of constructing the three apartment houses was $26,600. The property at 2920 Healy Avenue, Far Rockaway, New York, was acquired by petitioner *112 in 1934. At the time acquired by petitioner, the property consisted of a lot 100 feet by 200 feet in dimensions on which there was a three-story frame one-family summer house about 40 years old. After acquiring the property the petitioner razed most of the house and erected on the lot a building containing two six-room apartments with two baths each and two four-room apartments with one bath each. All the apartments had private porches and were heated by steam. The petitioner also erected a four-car garage on the property. The cost of constructing the apartment building and the garage was $6,500. In 1934 or 1935 the petitioner acquired the property at 2802 Bayswater Avenue, Rockaway, New York. At the time of acquisition the property consisted of a corner lot with a frontage of approximately 100 feet on Beach 28th Street and a frontage of approximately 150 feet on Bayswater Avenue and the debris from a burned down building which formerly stood on the lot. The petitioner erected on the lot two attached houses, each of which contained a six-room apartment with two baths and a four-room apartment with one bath. Each of the apartments was heated by steam. The petitioner also erected *113 a four-car garage on the property. The cost of constructing the houses and the garage was $6,500. About 1933 the petitioner acquired the property at 1900 Lockwood Avenue, far Rockaway, New York. At the time acquired by petitioner the property consisted of a lot 50 feet by 200 feet at the intersection of Brookhaven and Lockwood Avenues on which were a bowling alley and a frame building, which was in a bad state of repair and which was used as a tavern. The petitioner demolished the frame building and bowling alley and during 1934 and 1935 erected on the lot five brick structures consisting of the following: one one-story retail store building, three two-story two-family houses, and one one-story one-family house. In addition, the petitioner erected a three-story brick veneer rooming house. The cost of the foregoing structures was $20,000. The petitioner acquired the property at 1362 Gipson Street, Far Rockaway, New York, about 1933 or 1934. At the time acquired the property consisted of a lot 100 feet by 150 feet in dimensions on which was an abandoned three-story one-family frame summer house. Upon acquiring the property the petitioner demolished most of the house and on the *114 lot erected three two-family houses. Two of the houses contained two six-room apartments with "six baths" to each apartment and two three-room apartments with one bath to each apartment. The third house contained two four-room apartments with one bath to each apartment. In addition, the petitioner erected on the lot a six-car garage. The cost of the houses and the garage was $15,000. The property at 7236 Burchell Avenue, Rockaway Beach, New York, was originally acquired by petitioner as vacant land through purchases made in 1932 and 1934. The land was situated in an industrial neighborhood and between 1932 and 1935 the petitioner erected successively three one-story factory buildings on the property. Each of the buildings was of heavy duty construction and contained about 4,000 square feet of floor space, had a drive-in loading platform and had an oil burner in it. The cost of the three buildings was $12,000. In 1924 the petitioner's wife purchased 709 West Beech Street, Long Beach, New York, sometimes hereinafter referred to as the Beech Street property or premises. At that time the property consisted of a corner lot 50 feet by 52 feet in dimensions. On it was "a portable *115 Army bungalow," about 20 feet by 20 feet in size and contained five rooms. In 1925 the structure was "modernized" and an extension added to make it a seven-room bungalow. In 1924, and at all times subsequent thereto through 1947, the area in which the property was situated was a "summer zone area," and usually was occupied only during the period from or about May 1 to around September 1. Beginning with the summer of 1926 and continuing until sometime in the early 1930's, the petitioner and his family occupied the property as their summer home for or about 10 weeks each summer. Some time in the early 1930's Premium Bond Corporation, all of the stock of which was owned by petitioner and his family, purchased the Beech Street property for an undisclosed consideration. In 1934 Premium Bond Corporation decided that improvements should be made which would provide for the use of more than two bathrooms which were then in the building and more than one kitchen which was then in the building. A local architect was consulted. He advised that the premises could be altered so as to accommodate five families and provide each of them with a bathroom and a kitchen. The architect prepared plans *116 for the erection on the lot of a two-story apartment house containing five apartments with a total of 21 rooms. In October 1934 the plans were filed with the Building Department of the City of Long Beach. That department approved the plans and issued a permit for the erection of the apartment house. Thereupon Premium Bond Corporation entered into contracts for the work to be done in the erection of the apartment house. The structure then on the lot was practically demolished and an apartment house was erected on the lot in accordance with the architect's plans. The apartment house was completed about May 1, 1935, at a cost of $6,500, and was inspected and approved by the Building Department of the City of Long Beach. In May 1935 Premium Bond Corporation leased the property to Ida Gollin, the petitioner's sister, who paid the corporation $8,500 for a 5-year lease on the property and who in turn proceeded to rent the apartments in the building to others. In May 1936, the Building Commissioner of the City of Long Beach notified Premium Bond Corporation that the apartment house was being operated in violation of that portion of the city's zoning ordinance which provided that "No building *117 shall be erected or altered to make provision for more than one family for each 1,800 square feet of the area of the lot." Demand was made for the immediate discontinuance of the use of the building and notice was given that failure to do so would result in the immediate cancellation and revocation of certificate of occupancy and prosecution for violation of the zoning ordinance. Premium Bond Corporation instituted in a New York court an action against the city of Long Beach and others, supported by an affidavit executed on June 4, 1936, by petitioner as president of Premium Bond Corporation. In this action Premium Bond Corporation sought and obtained an order granting its motion for a temporary injunction restraining the city and its officers from interfering with Premium Bond Corporation in its use of the Beach Street premises, and from prosecuting any claim of violation of the zoning law with regard thereto. However, on appeal by the defendants the action was terminated adversely to Premium Bond Corporation on the ground that the adoption of a zoning ordinance is a governmental function and that the city of Long Beach was not estopped from enforcing the provisions of its zoning *118 ordinance because of any acts or conduct on the part of any of its administrative officers. Premium Bond Corporation v. City of Long Beach, et al., 291 N.Y. Supp. 834 (Dec. 15, 1936). In 1937 the petitioner for the first time became the owner of the Beech Street property. The consideration he paid therefor is not disclosed by the record. Thereafter he continued to own it until he sold it in 1947. After petitioner acquired the property it was used merely as a summer residence, with petitioner's family using the lower floor through the summer of 1947, and the upper floor being rented to two or three other families for a total rent of $1,800 per summer. In December 1947 the petitioner sold the property - land and apartment house thereon - for $16,000. In his income tax return for 1947 the petitioner deducted $37,056.10 as an ordinary loss sustained "on sale of house." In a schedule attached to the return the deduction was explained as follows: "Loss on Sale of House.
"In 1924 I purchased a house
at 709 W. Beech St., Long Beach.
The cost and current im-
provements then cost me
$16,030.20
"Between 1932-1934 I spent
$36,225.90 to improve this prop-
erty, so that it would be an
apartment house
36,225.90
$52,256.10
"Soon after the change was com-
pleted, I learned that the Depart-
ment of Buildings had NO
6EGAL right to approve my
plans or permit the apartment
house because the section was
zoned against apartment houses.
ONLY one tenant was per-
mitted to live in this house, as
it was a one family zone. I
leased the property for 15 years
to the lender of the mortgage
funds, and I paid the annual
taxes and interest. The income
was negligible. I also made
annual payments on the princi-
pal of the mortgage. Finally
the debt came down to $17,700.
"On December 16th, 1947 I sold
the property for $16,000, which
after allowing brokerage, netted
me
15,200.00
"Loss on the deal was
$37,056.10
"The rental income was enough
from the one apartment to pay
the maintenance and repair and
watchman charges on the house."
*119 In determining the petitioner's net income for 1947 the respondent disallowed the foregoing deduction taken by petitioner in his return and determined that petitioner realized a long-term capital gain of $7,812.03 on the sale of the Beech Street property computed in the following manner: Net sales proceeds
$15,343.81
Basis for gain or loss
7,531.78
Gain
$ 7,812.03
Opinion We will consider first the question of the amounts deductible by petitioner for 1945, 1946, and 1947 for depreciation of the property at 709 West Beech Street and the amount, if any, deductible by him for 1947 as a loss sustained on the sale of that property. The petitioner takes the position that the record shows that during the years 1925 through 1947 he expended a total of $59,850.01 as the purchase price of and capital improvements on the Beech Street property; that in 1947 he sold the property and certain furniture therein for $16,000, and that of that amount $10,000 represented the selling price of the real property; and that as shown in his income tax return for 1947 he sustained a loss of $37,056.10 on the sale of the real property. The petitioner takes the further position that *120 the record shows that during 1947 and for some years prior thereto he was engaged in the business of buying and selling real properties and contends that therefore the foregoing loss is deductible in full as an ordinary loss sustained by him in his business. The recitals contained in the schedule attached to petitioner's return for 1947 are to the effect that in 1924 petitioner purchased the 709 West Beech Street property and that the cost of the property plus the cost of current improvements thereto was $16,030.20; that while continuing to own the property he expended between 1932 and 1934 the amount of $36,225.90 to improve the property with the erection of an apartment house thereon; that soon after he had expended a total of $52,256.10 for the property and the improvements thereon he learned that the property was situated in a "one-family zone" and that only one tenant was permitted to live in the house; that he then leased the property for 15 years but the income from the property was negligible; and that on December 16, 1947, he sold the property for $16,000, which, after deducting brokerage, netted him $15,200, thereby sustaining a loss of $37,056.10 on the sale of the property. *121 At the trial herein the petitioner testified that his wife purchased the property in 1924 or 1925 at a cost of $7,500; that after purchasing the property the structure thereon was modernized and an extension made thereto at a cost of $8,500; that thereafter he and his family used the property for their summer home, and that in the early 1930's Premium Bond Corporation acquired the property. The affidavit executed by petitioner on June 4, 1936, in support of the action brought by Premium Bond Corporation against the city of Long Beach and others shows that the corporation acquired the property by purchase but does not state the consideration paid therefor. Nor does the instant record show the consideration paid by Premium Bond Corporation for the property. At the trial herein the petitioner testified that 2 or 3 years were required for the construction of the apartment house and that it was completed about 1935 or 1936 at a cost of or about $12,000. In his affidavit of June 4, 1936, heretofore referred to, the petitioner stated that the plans for the erection of the apartment house on the property were filed with the Building Department of the city of Long Beach on October 29, 1934, that *122 the work of erecting the apartment house continued for a period of or about 6 months and that the apartment house was completed about May 1, 1935, at a cost of $6,500. In his affidavit he further stated that after completion of the apartment house and during May 1935 it was leased by Premium Bond Corporation to Ida Gollin, as lessee. At the trial herein he testified that the property was leased to her for 5 years and that she paid $8,500 for the lease. He stated that while the apartment house was used as a five-family apartment house neither he nor his family occupied any of the apartments and that the apartments rented for $800 each per summer or approximately $4,000 per summer for the five apartments. Respecting his acquisition of the 709 West Beech Street property in 1937, the petitioner testified that about 1930 a loan of $40,000 was obtained by Premium Bond Corporation from Agnes Bails, that in connection with the loan the property in question was pledged to her and title to the property stayed in her name until she was paid, that subsequently Warranty Holding Corporation paid to her the amount (an amount not disclosed by the record) then owing to her by Premium Bond Corporation *123 and thereupon Warranty Holding Corporation became the owner of the property, and that thereafter, about 1936 or 1937, he paid the indebtedness of Premium Bond Corporation then owing to Warranty Holding Corporation, and which the latter had acquired from Agnes Bails, and thereupon became the owner of and acquired title to the property in question. The petitioner testified that he was unable to recall the amount of the payment he thus made to Warranty Holding Corporation to acquire the property. The petitioner testified that about 1938 or 1939 he converted the five-family apartment house to a two-family apartment house and in so doing made certain expenditures. He gave no testimony respecting the extent of the alterations or changes made to effect the conversion or respecting the cost of the conversion. Nor does the record contain any evidence directed to such matters. Evidence as to the location of certain furniture in the apartment house in October 1947 discloses the existence at that time of three apartments on the second floor. The evidence also discloses that after the time of the purported conversion rents were received from two or three families who occupied the second floor. *124 The evidence relating to the location of the furniture on the lower or first floor indicates that that floor contained a large apartment within which was a small apartment. From the record presented we are not able to find that petitioner expended any substantial amount to convert the apartment house from one of five apartments to one of a lesser number of apartments. In support of his position that total capital expenditures of $59,850.01 were made for the Beech Street property and the improvements thereon from 1924 through 1947, the petitioner relies on Exhibit No. 24. This exhibit was submitted in evidence by petitioner as a schedule by years of several hundred checks, totaling $43,269.87, stated by petitioner to have been issued by him for "alterations and repairs" made to the property in question, during the years from May 1935 through 1947, and purported to include payments of bills incurred in the construction of the apartment house on the property. On cross-examination the petitioner admitted that he had no bills with respect to which the various checks were issued and further admitted that except for isolated instances when he was physically present when work was being *125 done, he had no present personal recollection of the purposes for which the checks listed in Exhibit No. 24 were issued. In view of the foregoing admissions of the petitioner we are unable to conclude that the total amount of the checks, $43,269.87, or any lesser amount was expended by him for capital items. In this connection the parties stipulated during the trial that the checks listed in the exhibit for 1945 and certain of the checks listed for 1946 and 1947 had been allowed by respondent, apparently as repairs, in determining the petitioner's net income for the respective years. The respondent has determined that the cost of the land and the apartment house constituting the Beech Street property was $19,000 and that 20 per cent of that amount, or $3,800, represented the value of the land, thus leaving $15,200 as the cost of the apartment house. As the record stands we are unable to find any other amounts as the cost to the petitioner of those items. The parties are in agreement that the applicable rate of depreciation for 1945, 1946, and 1947 was 3 per cent per annum. For 1945, 1946, and 1947 the respondent has allowed depreciation on the apartment house at the rate of 3 per *126 cent per annum computed on a cost of $15,200. We cannot find that any greater amount is allowable. Relying on a contract of sale and a copy of a bill of sale, submitted in evidence by him, and certain testimony given by him with respect thereto, the petitioner takes the position that of the $16,000 reported by him in his income tax return for 1947 as the sales price of the Beech Street property - land and apartment house - $6,000 represented consideration for certain furniture that was in the apartment house, that accordingly, $10,000 was the sales price of the premises and that only the latter amount should be used as the sales price in computing gain or loss on the sale of the land and apartment house. At the trial the petitioner placed in evidence a contract of sale dated October 20, 1947, wherein petitioner is described as the seller and "Pauline Langstein or assigns" is described as the purchaser. The contract ostensibly was signed by petitioner and Pauline Langstein as the parties thereto and recites the agreement of the seller to sell and convey and the agreement of the purchaser to purchase the lot with the improvements thereon known as 709 West Beech Street and all of *127 the furniture then on the premises, with certain stated exceptions, for the price of $16,000. The contract of sale does not contain any segregation or allocation of the $16,000 between the premises and the furniture. The contract provided for delivery of deed to the premises on November 25, 1947. Although "Pauline Langstein or assigns" is described in the contract of sale as the purchaser, the petitioner, without showing that she made an assignment of any of her rights under the contract, placed in evidence an instrument which he identified as a copy of the original bill of sale executed by him on November 25, 1947, to the purchaser of the furniture, and which shows the sale of the furniture to Langsurf Realty Corporation for a consideration of one dollar and "other good and valuable consideration." Respecting the sale of the furniture and the Beech Street property, the petitioner testified that in December 1947 he sold the latter "to some people who wanted to use it - there were two or three families - and they wanted to use it for their own occupancy" and they insisted that the furniture in the building "go with the property so that they could live in it as a summer house." To obviate *128 the failure of the contract of sale to contain an allocation of the stated sale price of $16,000 between the premises and furniture on the premises, the petitioner testified that he had an agreement with the purchaser that $10,000 was for the premises and $6,000 was for the furniture. Concededly the petitioner has no documentary evidence which tends to prove an allocation of the $16,000. Nor was the testimony of Pauline Langstein or any other person shown to have been connected with the purchase of the furniture or of the premises offered in corroboration of petitioner's testimony. Furthermore, the petitioner did not submit any evidence respecting the time of his acquisition of the furniture, its cost to him, the amount of depreciation allowed or allowable with respect thereto during his period of ownership or any other information tending to show that the allocation testified to by him was a proper or reasonable one. As the record stands it presents considerable doubt as to whether the contract of sale between petitioner and Pauline Langstein was ever carried out. As indicated above the bill of sale does not show that the furniture was sold to Pauline Langstein, or to a party shown *129 to have been an assignee of hers or to a party occupying any contractual relationship to her. The contract of sale, which was dated October 20, 1947, provided for delivery of deed to the premises on November 25, 1947. The petitioner testified that the premises were sold in December 1947 and in a schedule attached to his income tax return for 1947 he was more specific, showing the date as December 16, 1947. The petitioner offers no explanation of the foregoing departures from the terms of the contract of sale. Although the petitioner testified that the premises were sold for $10,000 and the furniture for $6,000, he stated in a schedule constituting a part of his income tax return for 1947 that the premises were sold for $16,000. There is not anything in the return or any schedule attached to it which shows or even indicates that the petitioner sold any furniture in 1947. Since the petitioner makes no attempt to reconcile his testimony herein with his return or to explain the contradictions between the two, and since we are unable to make such reconciliation, we cannot find that the sales price of the land and apartment house at 709 West Beech Street was less than $16,000. The respondent *130 has determined that petitioner's basis for gain or loss on the sale of the Beech Street premises was $7,531.78. The petitioner contends that in substance the respondent has allowed as a basis only the original cost of the property despite testimony that the building subsequently was modernized and enlarged, that later it was converted into a five-family apartment house, and that thereafter it was converted into a two-family apartment. The evidence shows that petitioner's wife purchased the Beech Street premises in 1924, that subsequently in the early 1930's Premium Bond Corporation acquired the premises, and that in 1937 the petitioner acquired them. From the factual situation shown to have existed with respect to Premium Bond Corporation and in view of what has been said heretofore in the case of Albob Holding Corporation as to the recognition or nonrecognition of the identity of corporations, we think Premium Bond Corporation during the period of its ownership of the Beech Street premises is to be regarded as an entity separate and apart from petitioner and petitioner's wife. According to petitioner's testimony the title and ownership of the premises in question passed from Premium *131 Bond Corporation to Agnes Bails, from her to Warranty Holding Corporation, and from the latter to the petitioner. The petitioner was unable to recall the amount he paid to Warranty Holding Corporation to acquire the premises in 1937. Section 113(a) of the Code of 1939 provides that the unadjusted basis of property shall be the cost of such property with certain exceptions inapplicable here. Section 113(b)(1) provides that the adjusted basis for determining gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under section 113(a) adjusted in respect of any period since February 28, 1913, for exhaustion, wear and tear, and obsolescence to the extent allowed or allowable. Except for the years involved herein, 1945 through 1947, we are not informed as to the amount allowed or allowable to petitioner with respect to the exhaustion, wear and tear, and obsolescence of the property during the period of his ownership which began in 1937. For lack of evidence to show error, we sustain the respondent's determination as to the basis for computing *132 gain or loss. Accordingly, we sustain respondent's disallowance of a deduction of $37,056.10 taken by petitioner as a loss sustained on the sale of the property and sustain respondent's determination of a long-term capital gain of $7,812.03 on such sale. Since the parties are in agreement that the rate of depreciation properly applicable for the taxable years in question is 3 per cent, the remaining question for determination here is the amount of the basis upon which depreciation is to be allowed with respect to the following properties as to which the respondent has allowed deductions for depreciation: 300-316 B. 67th Street, 2920 Healy Avenue, 2802 Bayswater Avenue, 1900 Lockwood Avenue, 1362 Gipson Street, 7236 Burchell Avenue The petitioner contends that on the basis of his testimony as to the buildings on the respective properties, the approximate cost thereof and the amounts on which depreciation is to be computed, he should be allowed depreciation deductions in the amounts taken by him in his income tax returns for the years in question. The respondent takes the position that the record fails to show that the petitioner is entitled to any greater deductions for depreciation *133 than those allowed by him. On direct examination the petitioner testified as to the time of his acquisition of each of the above-named six properties, the character of the buildings thereon, if any, at the time of acquisition, the buildings he subsequently erected thereon, and as to the total cost of land and buildings on each property and the portion of such total cost at which he appraised the buildings as the "value for depreciation" purposes. As to each of the first five of the properties the amounts testified to by him were identical with the amounts shown in his income tax returns as property cost and improvements and value for depreciation. The sixth or the 7236 Burchell Avenue property was not listed in petitioner's returns as a property with respect to which he took a deduction for depreciation. However, as to that property petitioner stated that the total cost of the land and buildings was approximately $70,000, that of that amount approximately $60,000 was the cost of the buildings, and that he valued the buildings at or about $40,000 for depreciation purposes. During cross-examination the petitioner admitted that he did not have any contracts, deeds, or other papers, *134 or other records of any kind, which would indicate the original cost of any property involved in this case on which he had taken depreciation except his income tax returns which he had followed from year to year for reference because he made no other improvements on the properties since making those he testified to on direct examination. He further stated that the amounts which he testified to on direct examination as the costs of improvements placed on the properties were not based on his recollection as to such costs but were obtained by reference to "my tax reports going many years back." However, petitioner did not offer in evidence any income tax returns, or copies thereof, for prior years in support of his testimony. Inasmuch as petitioner in his income tax return for 1947 showed a cost of more than $36,000 for constructing the apartment house on the Beech Street property, heretofore considered, and as he testified at the trial herein that the cost was about $12,000, and as he stated in his affidavit of June 4, 1936, that the cost was $6,500, it would appear that petitioner's income tax returns for prior years constituted a questionable source of information as to property costs. *135 In view of the foregoing we are unable to conclude that the amounts shown in petitioner's income tax returns for the years in question as the cost of the properties here under consideration are indicative of actual cost or that the amounts set out in petitioner's income tax returns as "value for depreciation" represent the cost of the depreciable structures on the properties. Consequently, we are unable to find that the petitioner is entitled to the depreciation deductions taken by him in his income tax returns for 1945, 1946, and 1947 with respect to five of the properties here involved, or that the amount of $40,000, testified to by petitioner as the "value for depreciation," should be used as a basis for computing depreciation of the Burchell Avenue property. On the other hand, from a consideration of the evidence as to the number, character, and size of the buildings erected by petitioner on the six properties, we are of the opinion that the basis used by respondent in computing depreciation on such properties is inadequate with respect to each of them and that the rule of Cohan v. Commissioner, 39 F.2d 540, is applicable here. In the absence of more reliable *136 evidence as to building costs in 1934 and 1935, we have accepted as substantially correct the statement made by petitioner in his affidavit executed June 4, 1936, that the cost to Premium Bond Corporation of erecting in 1934 and 1935 on the Beech Street property a 21-room apartment house, consisting of five apartments, was $6,500 and have so found as a fact. Applying the rule of the Cohan case and applying the foregoing finding as best we can to the evidence presented as to the buildings erected by petitioner on the six properties here under consideration, we have found as a fact with respect to each property the cost of the buildings erected thereon by petitioner. The costs so found constitute the basis for computing the allowable depreciation with respect to the respective properties. During the entire year 1947 Albob Holding Corporation owned the property at 1900 Lockwood Avenue and that at 7236 Burchell Avenue. In his income tax return for 1947 the petitioner took a deduction for depreciation of the Lockwood Avenue property but did not take any deduction for depreciation of the Burchell Avenue property. The respondent allowed the petitioner a depreciation deduction with respect *137 to each of the properties. The petitioner was not entitled to a depreciation deduction for 1947 with respect to either of the properties. Issue 9. Deductions on account of lumber operations on property in Otis, Massachusetts. Findings of Fact In 1946 the petitioner became interested in purchasing a tract of approximately 150 acres of wooded land situated in Otis, Massachusetts, and having frontage on a lake. Formerly the property had been used as a Boy Scout camp. About 1920 the Boy Scouts erected on the property a building which they used as a social hall and a building which they used as an infirmary. Each building was constructed of logs. In addition, they constructed five cabins which were used by camp counselors. About 1931 and following the drowning of several boys in the lake as a result of a boat capsizing during a sudden storm, the Boy Scouts discontinued the use of the property for camp purposes. Thereafter and until the petitioner purchased the property about August 1946 it was not used for any purpose and no attention was given to the maintenance of the property. During 1946, and prior to purchasing the property, the petitioner attempted to go over it and inspect *138 it and the buildings on it. Little could be seen of the property from the entrance gate to it. What had formerly been a road leading from the entrance gate into the property was covered with a growth of trees and brush from 15 feet to 20 feet in height and one could not readily walk into the property. With the aid of one who had been acquainted with the property when it was used as a Boy Scout camp the petitioner went into the property as far as the social hall building. He found that the building was overgrown with brush, plants were growing from the outside into the building, the windows were out, and the building was in a state of general disrepair. The petitioner saw the infirmary, which was about 200 feet from the social hall, but did not further examine it. The petitioner obtained appraisals as to the value of the wood or timber that was on the property, concluded that if he "cleaned it [the property] up," he could see what it looked like and purchased the property without seeing the five cabins which had been used by camp counselors. In 1946 and after purchasing the property the petitioner engaged the services of Willard Clough, who with others and power saws and brush cutters *139 "blazed a path" through the property so as to give the petitioner access to each of the buildings on the property and to enable him to make a general examination of the property. For such services the petitioner paid $1,378.50 in 1946. Thereafter upon inspecting the buildings the petitioner found that the infirmary building was overgrown similarly to the social hall, the roof was down, the windows were broken and the building was in a state of general disrepair. The petitioner also found that three of the cabins were in a state of general disrepair and that two of them had fallen down and constituted merely the "remnants" of those cabins. During the first part of 1947 the petitioner engaged the services of a carpenter in Otis, Massachusetts, who after examining the five cabins, the social hall, and the infirmary, informed the petitioner that the latter two buildings could be put into "insurable conditions" through the use of the salvage from the other buildings and the purchase by petitioner of such materials as glass, roofing material, tar paper, concrete blocks, cement, and other required materials. Petitioner directed him to proceed with the work as suggested. Completion of *140 the work required the services of the foregoing carpenter and another carpenter for a period of 7 or 8 weeks. Of the buildings which were on the property at the time the petitioner purchased it in 1946, only the social hall and the infirmary remained on the property at the end of 1947. The cost of putting those two buildings in "insurable conditions" is not disclosed by the record. During the first part of 1947 the petitioner employed William Harris of Otis, Massachusetts, as a carpenter to work on buildings on the petitioner's property in Otis. While continuing in the employment of petitioner, Harris became the overseer of petitioner's property in Otis and remained in the petitioner's employment until December 1948. At the time the petitioner employed Harris the following buildings were standing on the property: the social hall, the infirmary building with a porch, a small one-room building about the size of a garage and a three-room bungalow type of log cottage. The first work Harris did for the petitioner was to construct an addition of two rooms to the three-room cottage so as to complete it as a summer cottage. The cost of the foregoing addition is not disclosed by the record. *141 During the course of his employment by petitioner, Harris received many letters from the petitioner. Among the matters discussed in the letters were plans for cottages that might eventually be erected upon the property and plans for additions to buildings then on the property. In the fall of 1947 the petitioner began cutting timber from the property and sawing it into lumber. In so doing the petitioner contracted for the services of the following: a wood chopper who had mechanical equipment for cutting down trees and cutting them into logs; a logger who hauled the logs from where they had been cut to the sawmill; and a sawyer who had a "portable" sawmill operated by a gasoline engine. For his services in sawing the logs into lumber, the sawyer was paid $15 per 1,000 feet of lumber sawed or a total of $1,650 for the services he rendered in 1947. For his services in hauling the logs to the sawmill, the logger was paid $10 per 1,000 feet of lumber sawed from the logs he had hauled or a total of $1,100 for the services he rendered in 1947. For his services, the wood chopper also was paid an undisclosed amount per 1,000 feet of lumber sawed. The petitioner also engaged the services *142 of some others who cleared openings in the woods through which they trucked lumber from the sawmill to a given area on the property where they stacked or piled it. These persons also gathered and burned brush. Neither the measure of payment for nor the amount paid for their services is ascertainable from the record. Some of the timber that was cut and sawed was hardwood and some was softwood. Some of the timber was cut into lengths and sawed into sizes suitable for use in construction of small bungalows and some was cut and sawed for general use. The petitioner did not have a kiln for drying lumber. Beginning in October 1947 and continuing into December of that year the petitioner made sales of lumber, slabs, and sawdust produced from timber cut from the property and received therefrom $6,855.10. The sales were made after the petitioner had advertised in three newspapers in the Otis area that he had such materials for sale. Purchasers came to the property, selected what they wanted, paid for it, and trucked it away. At the close of 1947, 44 of a total of 157 piles or stacks of lumber produced in 1947 remained unsold. For purposes of the personal property tax imposed by the town *143 of Otis for 1948, the town assessor valued as of January 1, 1948, the unsold lumber at $2,000 and certain machinery which petitioner had upon the property at $4,000. For purposes of the real estate tax imposed by the town of Otis for 1947 and 1948, the petitioner's land in Otis and the buildings thereon were valued by the town assessor as follows: Date
Land
Buildings
Total
January 1, 1947
$3,000
$2,000
$5,000
January 1, 1948
3,400
2,000
5,400
In the summer of 1947 there was a path from the entrance gate to the Otis property to the lake on which the property fronted, a distance of or about 4,000 feet, but no road over which a vehicle could be driven. Thereafter and prior to December 1948 a road was constructed from the gate to the lake. This was accomplished in part by improvements made to what formerly had been a dirt and gravel road and in part by building about one-half mile of new road of gravel construction, a swampy portion of which was filled with large stones. The construction of the road to the lake was part of plans for building a road around the property to a point where it would connect with another road. However, the proposed road around *144 the property was never constructed. Also during the same period a way was cleared for the construction of another road and slabs were laid and covered with sawdust as the start of that road. The cost to the petitioner of the work on the above-mentioned roads is not determinable from the record. During 1947 the water well on the property went dry and petitioner paid $550 to get a new well, approximately 190 feet deep, drilled on the property. In 1948 and at a cost of $2,000, the petitioner, using certain materials then on the premises, erected on the property a building about 110 feet long and 30 feet or 40 feet wide. This building was erected to house, and eventually to serve as a place in which to operate, several woodworking machines which the petitioner had placed on the property to be used in cutting lumber for use in building small cottages or bungalows. The machines were equipped for cutting boards into smaller dimensions for finished work. After its completion the building was used for storage purposes and as a garage for a tractor. During 1949 and for an undisclosed reason the petitioner demolished the building. Sometime prior to December 1948 cinder blocks were purchased *145 and brought on the property and a machine for making cement blocks, having a rounded edge simulating log siding, also was acquired. However, no blocks were made with the machine. The cost to the petitioner of the lumber sold in 1947 was $4,900. Opinion On brief the petitioner contends that in 1946 and 1947 he was engaged in the business of conducting a lumber operation on his property in Otis; that as a preliminary to, but as a part of the operation, he expended $1,378.50 in 1946 in improving roads on the property; that in 1947 he expended $25,862.93 in the conduct of the lumber operation; and that the foregoing amounts were properly deductible in the respective years as ordinary and necessary expenses incurred in the conduct of his business and should have been allowed as deductions by respondent in the determination of his income for the respective years. The respondent contends that if the petitioner expended the amounts in question, they were not expended in the conduct of a lumber business but were made for the conversion of timber into lumber which the petitioner had planned to use in the construction of summer resort cottages and the development of the property into a *146 summer resort, and that consequently the expenditures constituted capital expenditures. The respondent further contends that a comparison of the amount in question for 1947, $25,862.93, with the amount of the proceeds from the sale of lumber received by petitioner in that year, $6,855.10, indicates that the petitioner did not engage in the removal of the timber from the property with the objective of realizing a profit from the removal and disposition of the timber. The petitioner testified that he purchased the property in Otis for $10,000; that the property was purchased as a venture; and that his sole purpose in purchasing it was to remove the timber therefrom and then sell the land. If the property was purchased for the purpose stated by the petitioner, we would expect a showing of a course of conduct by petitioner clearly evidencing such a purpose. Instead the record clearly shows that after cutting a path through the property in 1946 to obtain access to seven dilapidated buildings, the petitioner in the first part of 1947 engaged in the complete demolition of five of the buildings and the restoration of two others to "insurable conditions." The record is silent as to the use *147 made of the two buildings after their restoration. Also in the first part of 1947 he engaged in the enlargement of a building not shown to have been on the property when purchased by petitioner so as to convert it into a summer cottage. The use made of the building after its conversion to a summer cottage is not shown. In 1948 the petitioner constructed on the property, from materials on the property and at a cost of $2,000, a large building to be used for housing certain machinery not shown to have been used in any timber or lumber operation on the property, and which building the petitioner demolished for an unexplained reason in 1949. During the petitioner's employment of Harris, the petitioner in correspondence with him discussed plans for cottages that might eventually be erected upon the property. A consideration of the foregoing in connection with the fact that timber cutting and sawing operations were not begun until about a year after the petitioner's purchase of the property indicates some modification by petitioner of his original purpose in acquiring the property, some of which, according to him, he did not inspect before purchasing it. With the exception of the cottage *148 which was converted into a summer cottage by an addition thereto, the record is clear that the petitioner never engaged in the construction of cottages on the property. Accordingly, we are unable to find as respondent contends that petitioner had planned to use the lumber produced in 1947 for the construction of cottages on the property and the consequent conversion of the property into a summer resort. Section 24 of the Code of 1939 provides as follows: "SEC. 24. ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - * * *
"(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate;" In view of the foregoing provisions of the Code we are of the opinion that the $1,378.50 paid by petitioner in 1946 for clearing a path through the property so as to make the buildings and other portions of the property more accessible was not an allowable deduction. At the time the petitioner purchased it, the property did not have any means of *149 ready access to the buildings and the other portions of the property. The expenditure in question provided such an access not only for the year in which made, 1946, but also in subsequent years and accordingly was a nondeductible capital expenditure. The petitioner has not submitted any evidence directed to the number of feet of lumber produced in 1947 or as to the number of feet remaining unsold at the close of 1947. The record of the sales of lumber kept by the petitioner shows sales by stacks or piles and not by feet. The lumber inventory at the close of 1947 is also shown in piles and not in feet. Apparently there was considerable variation in the quantity or kind of lumber contained in the different piles, as the record of sales shows sales of piles ranging in price from $10 per pile to $90 per pile. From the evidence relating to the payments, totaling $2,750, made by petitioner to the sawyer and the logger for the services rendered by them in those capacities for 1947, it appears that 110,000 feet of lumber was sawed in 1947. The only other parties engaged in the production of lumber were the wood chopper, who cut down the trees and cut them into logs, and those persons who *150 trucked the lumber away from the sawmill to a location on the property where they stacked or piled it. Neither the amount paid the wood chopper nor the cost to the petitioner of the services of those who trucked the lumber away from the sawmill and stacked or piled it is ascertainable from the record. In contending that he is entitled to a deduction of $25,862.93 for expenses incurred in the conduct of his lumber business in 1947 the petitioner is in substance contending that he expended $25,862.93 in the production of 110,000 feet of lumber and in selling a portion of such footage. Since the petitioner expended only $2,750 for two of the four processes involved in the production of 110,000 feet of lumber from the standing tree to the stacked or piled lumber and has not shown the amount expended for the other two processes, nor has established a basis for concluding that an amount substantially different from $2,750 was expended on account of such other two processes, it would appear that petitioner's direct costs in the production of the lumber were not more than $5,500. Reducing the amount contended for on brief, $25,862.93, by $5,500 would leave $20,362.93 as indirect costs of *151 the lumber produced in 1947 and as advertising and other selling expenses of the lumber sold in that year. From our consideration of the record, we are unable to find that the petitioner expended such a sum or any other sum approximating it for such purposes. Although not adverted to by petitioner on brief, the petitioner testified that included in the amount of $25,862.93 here in controversy was an amount of $8,129.01 for "supplies and machinery" (not otherwise described), "a good portion of which was expendable with the operation of the mill," that he - "set up an inventory as agreed upon by the tax assessor in December 1947, as follows: Lumber in piles, inventory at a value of $2,000, and the remainder of used machinery that had not yet been expended on the operation $4,000, making a total of $6,000 inventory. "I reduced my expenditures of $25,862.93 by $6,000, thus indicating that the lumbering operation cost me in 1947, $19,862.93." In addition to failing to give us any information respecting the character or nature of the above-mentioned "supplies and machinery" or as to the portion of the amount of $8,129.01 which represented the cost of the supplies or the cost of the *152 machinery, the petitioner has also failed to show how either the supplies or the machinery was expendable with the operation of the sawmill. The evidence shows that the sawyer was employed as an independent contractor who used his own machinery and equipment, provided his own help, and was paid a stated sum per 1,000 feet of lumber that he sawed. Apparently the petitioner seeks to effect compliance with the provisions of section 22(c) of the Code of 1939 relating to inventories and relevant sections of Regulations 111 by using, for the purpose of the inventory of lumber at the close of 1947, the dollar amount of the lumber as agreed upon by him and the town assessor of Otis, Massachusetts, for the purpose of personal property tax imposed by that town. The petitioner has not attempted to show the relationship of such dollar value to either the cost or the market value of the unsold lumber at the close of 1947, nor has he explained the basis upon which such dollar value was ascertained. Since the town assessor valued at $5,000 as of January 1, 1947, the petitioner's real property in Otis, and since according to petitioner's testimony he, only a few months before that date had purchased *153 that property for $10,000 and subsequently but prior to January 1, 1947, had expended $1,378.50 for improving it, it is apparent that the assessor's valuation bore no close relationship to either cost or market value of the real property and was less than one-half of cost and only one-half of the market value at the time the petitioner purchased it. If the pattern thus employed by the assessor be applied to the unsold lumber and the machinery, it would appear that the actual value of the lumber was about $4,000 and the actual value of the machinery was about $8,000. The parties have stipulated that the respondent in determining the petitioner's net income for 1947 has allowed as deductions the amounts of four checks, totaling $617.50, comprising a portion of the deduction now sought by petitioner. From the evidence presented we are satisfied that more than that amount was expended in producing and selling the lumber that was sold. Since the evidence does not enable us to determine with exactness what the correct amount was, we think the rule of Cohan v. Commissioner, supra, is applicable here. Applying that rule as best we can to the record before us, we have concluded *154 that the direct cost - chopping, logging, sawing, and trucking and stacking or piling - of the lumber sold was $3,700 and that advertising, selling, and other indirect costs of the lumber sold amounted to $1,200 making a total cost of $4,900. The latter amount we have found was the cost to petitioner of the lumber sold in 1947. In a recomputation of petitioner's net income for 1947 such amount will be allowed as a deduction. Issue 10. Taxability of the net income of Albob Holding Corporation for 1947 to petitioner as a dividend. Opinion According to statements of counsel for respondent, referred to above in the case of Albob Holding Corporation, the respondent has included in the income of the petitioner for 1947 the same income, $11,014.78, on which he determined the deficiency in tax against Albob for 1947. As set out in the deficiency notice mailed to the petitioner, the respondent has determined that Albob's net income for 1947, $3,013.94, also was taxable to the petitioner as a constructive dividend and has included that amount in the income of the petitioner for 1947. Since we have held in the case of Albob that it was a corporation whose entity is to be recognized and *155 have sustained the respondent's determination of the deficiency against it, and since the record shows a lack of basis for also including Albob's income for 1947, $11,014.78, in the income of the petitioner for the same year, we hold that the respondent erred in including it in the petitioner's income for 1947. In the case of Albob we have found as a fact that the petitioner never has been a stockholder in that corporation. In view of that finding and in the absence of evidence showing that the net income of Albob, $3,013.94, was otherwise taxable to petitioner, we hold that the respondent erred in including the amount in the petitioner's income for 1947. At the trial the respondent placed in evidence Exhibits M through CC comprising schedules in which are listed more than a thousand checks. Some of the schedules show check disbursements allowed as business expenses for stated years and others show check disbursements disallowed for stated years. Without in anywise attempting to relate the statement to any of the issues heretofore considered, the respondent makes the following statement on brief: "Respondent agrees that petitioner's net income, as reflected in the notice of deficiency, *156 for the years 1945 to 1947, inclusive, should be reduced by the respective amounts of $9,330.59, $8,920.00 and $12,698.23, pursuant to Exhibits M to CC, inclusive." In a recomputation of the deficiencies under Rule 50 effect will be given to the foregoing statement of the respondent. Issue 11. Liability of petitioner for additions to tax for fraud. Findings of Fact The petitioner's income tax returns for 1945, 1946, and 1947 were false and fraudulent and were made with intent to evade tax. Part of the deficiency for each of the years is due to fraud with intent to evade tax. Opinion The respondent has determined against petitioner for 1945, 1946, and 1947 the addition to tax provided in section 293(b) of the Code for fraud. The respondent has the burden of proof as to this issue and contends that the record establishes the correctness of his action. The petitioner contends that he kept adequate books and records and that the best proof that his records were adequate and complete is the fact that respondent was able to make a complete audit therefrom. The petitioner also contends *157 that, believing that he had in fact no taxable income for the years in question, he may have been careless in the preparation of his returns but that negligence or carelessness is not proof of fraudulent intent. We have found that the books and records maintained by the petitioner were inadequate for fairly or correctly reflecting the petitioner's income. Consequently, an audit made of them alone would not represent a complete audit of petitioner's affairs for the years in question. The petitioner did not maintain a cash book and the bank deposits standing alone would not necessarily represent the petitioner's receipts for the years in question because they would not include any cash or checks received but not deposited in the bank accounts. Although the record does not disclose the full extent of the respondent's audit, it does disclose that the audit made by respondent extended beyond the petitioner's books and records and included an examination of petitioner's bank deposits and an ascertainment of his receipts - cash and checks - which were not deposited in his bank accounts. The parties have stipulated in evidence schedules showing the deposits made by petitioner to the accounts *158 maintained by him in the various banks during the years in question. After the elimination from the deposits of inter-account transfers, exchanges, capital, and other nonincome items, the remaining balance for each of the years is greatly in excess of the total or gross income reported by the petitioner for the respective years. The reduction of such gross income for the respective years by the deductions allowed by the respondent plus those allowed by our holdings herein leaves for each of the years a substantial amount of taxable net income instead of a loss as reported by petitioner. From the record before us we think that the petitioner as a trained and experienced accountant and as a tax adviser was not only aware that his books and records were inadequate for fairly or correctly reflecting his income for the years in question but also was aware that they did not correctly or fairly reflect his income for such years and further was aware that his income tax return for each of the years in question, which he verified as "a true, correct, and complete return," was not a true, correct, and complete return. On his return for each of the years 1945, 1946, and 1947 the petitioner *159 stated that his occupation was "Real Estate, etc." Nowhere in the returns is there any disclosure that he also was engaged in rendering services as an accountant and as a tax counselor. Although in his return for 1945 he made an enigmatic segregation of his receipts from his accounting practice and his receipts from all other sources, he made no segregation whatever in his returns for 1946 and 1947. The gross incomes reported for 1946 and 1947 were shown as "Total income and rents from property" and "Total income from properties also fees," respectively, thereby concealing the fact that his gross or total income if correctly reported would include receipts from his services as an accountant and as a tax counselor. The amounts reported as total receipts or total income in his returns for 1945, 1946, and 1947 included not only undisclosed amounts of gross receipts from rental properties and undisclosed amounts of gross receipts from his services as an accountant and tax counselor but also undisclosed amounts of net receipts from those sources. By reporting some of his income from the foregoing sources as net receipts the petitioner concealed not only the amount of gross receipts involved *160 but also the character and amounts of the deductions he used in arriving at the amount of the net receipts. Such records as the petitioner made with respect to the income he received during 1945, 1946, and 1947 from his tax counseling services were destroyed by him long ago. The petitioner's testimony with respect to the tax lien involved in issue 3, supra, shows that upon payment of the lien in 1946 he realized, in excess of his cost and other outlay with respect to the lien, a substantial sum consisting of interest and gain, neither of which is mentioned in his income tax return for that year. An affirmative willful attempt to defeat and evade tax may be inferred from conduct such as the destruction of books or records, concealment of assets, or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind of such affairs and any conduct, the likely effect of which would be to mislead or conceal. Spies v. United States, supra. The respondent's determination for each of the years of the addition to tax provided *161 in section 293(b) of the Code is sustained. Issue 12. Expiration of period of limitations. Opinion We have heretofore found that the petitioner's returns for the years 1945, 1946, and 1947 were false and fraudulent and were made with intent to evade tax. Consequently, assessment and collection of deficiencies in tax for those years are not barred by the expiration of the period of limitations. Section 276(a) of the Code of 1939. Issue 13. Liability of petitioner for additions to tax for failure to file declarations of tax and for substantial underestimation of tax. Opinion The respondent has determined additions to tax for 1945, 1946, and 1947 under sections 294(d)(1)(A) and 294(d)(2) of the Code of 1939 for failure to file declarations of estimated tax and for substantial under-estimates of estimated tax. The petitioner has not adduced any evidence with respect to this issue. Accordingly, we sustain the respondent's assertion of such additions. William L. Heuer, Jr., 32 T.C. - (July 23, 1959). Decisions will be entered under Rule 50.